**NATIONAL UNION FIRE INSURANCE COMPANY OF PENNSYLVANIA, Plaintiff-Appellant,**

v.

**CARIB AVIATION, INC., and Gregg C. Fiddyment, Defendants-Appellees.**

No. 84–5636
Non-Argument Calendar.

United States Court of Appeals,
Eleventh Circuit.

May 7, 1985.

Rehearings Denied June 11, 1985.

Thornton, David & Murray, P.A., Kathleen M. O'Connor, Miami, Fla., for plaintiff-appellant.

Robert J. Schaffer, Coral Gables, Fla., for Carib Aviation, Inc.

Richard A. Friend, Ordonez & Friend, Miami, Fla., for G. Fiddyment.

Before RONEY, FAY and JOHNSON, Circuit Judges.

PER CURIAM:

National Union Fire Insurance Company of Pittsburgh, Pa. (National) appeals the summary judgment granted by the district court in favor of National's insureds, Carib Aviation, Inc. (Carib) and Gregg Fiddyment (Fiddyment). The district court found that an exclusionary clause in the insurance policy at issue was ambiguous and did not insulate National from liability because in Florida "only those exclusions that are clearly delineated by the express language of the policy" are effective. *National Union Fire Insurance Co. v. Carib Aviation,* 566 F.Supp. 1489, 1491 (S.D.Fla.1983). We,

however, conclude that the language of the exclusion is unambiguous and clearly excludes coverage under the facts of this case. We therefore reverse.

## I. FACTUAL BACKGROUND

The essential facts in this case are not in dispute. We thus consider it appropriate to quote the following from the district court's opinion:

This case concerns the crash of an airplane at sea during the attempted smuggling of marijuana into the United States. At the time of the crash, the airplane was leased by ... [Carib]. It was insured by National.... The airplane had been rented to a third party pilot/smuggler [Marchand] who had stated that he intended to fly from Tamiami Airport in Miami to Orlando and back. The pilot actually flew to the Bahamas. Had Carib known of his intention to fly outside of the United States, it would have required additional documentation.

On the return from the Bahamas, the airplane crashed in the Atlantic Ocean, twenty nautical miles east of Fort Lauderdale. The pilot and a passenger were rescued from a liferaft found floating amid several bales of marijuana. The pilot pled guilty to conspiracy to possess with intent to distribute marijuana and was sentenced to five years in prison.

The insurance policy named Carib and ... Fiddyment ... as insureds. The policy provided coverage for property damage to the aircraft, but contained the following exclusion: "This policy does not apply to: ... loss or damage *due to conversion,* ... *by any person in possession of the aircraft under a* bailment, lease, ... or other encumbrance, *nor for any loss or damage during or resulting therefrom.*

*Id.* at 1490 (emphasis added).

After the crash, Carib and Fiddyment demanded that National pay for the loss of the airplane. National refused, and filed a complaint seeking a declaratory judgment to the effect that coverage was excluded under the policy. The defendants, on the other hand, argued that the language of the coverage exclusion is ambiguous, and, therefore, should be strictly construed against National so as to provide coverage. The district court, faced with cross-motions for summary judgment, ruled against National. This appeal followed.

National argues on appeal that the district court erred in granting the insured a summary judgment because, based on the unambiguous language of the exclusion, there is no coverage provided under the policy for damages resulting from a conversion of the airplane by anyone in possession of the airplane under a lease. In National's view, the only real question in this case is, based on the undisputed facts, did Marchand "convert" the airplane under Florida law? Appellees, on the other hand, contend that the district court acted properly since the conversion exclusion in question is ambiguous. Specifically, appellees argue that: (1) the phrase "in possession" really means "in *lawful* possession;" (2) the phrase "under a lease" really means "under a *valid* lease;" and (3) Marchand did not *"convert"* the airplane within the meaning of the exclusion.

## II. THE LAW

Florida law is clear that "[o]nce the insured establishes a loss apparently within the terms of an 'all risks' policy, the burden shifts to the insurer to prove that the loss arose from a cause which is excepted." *Hudson v. Prudential Property & Casualty Insurance Co.,* 450 So.2d 565, 568 (Fla. 2nd Dist.Ct.App.1984). Moreover, ambiguities in exclusionary provisions must be construed in favor of the insured since the insurer usually drafts the policy. *See Excelsior Insurance Co. v. Pomona Park Bar & Package Store,* 369 So.2d 938, 942 (Fla.1979); *Southeastern Fire Insurance Co. v. Lehrman,* 443 So.2d 408, 409 (Fla. 4th Dist.Ct.App.1984); *Collins v. Royal Globe Insurance Co.,* 368 So.2d 941, 942 (Fla. 4th Dist.Ct.App.1979); *accord, Ideal Mutual Insurance Co. v. C.D.I. Construction,* 640 F.2d 654, 657 (5th Cir. Unit B 1981) (applying Florida law). If, however,

the language found in the policy is *not* ambiguous or otherwise susceptible of more than one meaning, the court's task is simply to apply the plain meaning of the words and phrases used to the facts before it. *Lehrman,* 443 So.2d at 408–09; *see also Excelsior,* 369 So.2d at 942 (rule of strict construction in favor of insured is apposite "[o]nly when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction"); *Denman Rubber Manufacturing Co. v. World Tire Corp.,* 396 So.2d 728, 729 (Fla. 5th Dist.Ct.App.1981) (same); *Ideal Mutual,* 640 F.2d at 657–58 (same). In other words, a court is not free to rewrite an insurance policy or add meaning to it that really is not there. *Excelsior,* 369 So.2d at 942; *Ideal Mutual,* 640 F.2d at 658.

## III. APPLICATION OF THE LAW

■ Appellees' first argument in support of the district court's judgment is that the exclusion is not effective because Marchand, who misrepresented his true intentions to Carib, was never "in possession" within the meaning of the exclusion. Appellees contend that Florida courts have consistently held that "lawful possession" of the insured property must exist before the exclusion is triggered. In support of this position, appellees refer us to *National Casualty Co. v. General Motors Acceptance Corp.,* 161 So.2d 848 (Fla. 1st Dist.Ct. App.1964); *Security Insurance Co. v. Investors Diversified Ltd.,* 407 So.2d 314 (Fla. 4th Dist.Ct.App.1981), and *Progressive American Insurance Co. v. Florida Bank,* 452 So.2d 42 (Fla. 5th Dist.Ct.App. 1984). We have reviewed these decisions and find them clearly distinguishable from the case *sub judice.*

In *National Casualty Co.,* the insurer issued an insurance policy to the purchaser of an automobile. The policy contained a mortgage clause in favor of G.M.A.C. as the lienholder. The purchaser, who had defaulted in making payments pursuant to the purchase contract, deliberately drove the insured vehicle off a bridge into the waters of Pensacola Bay. G.M.A.C. brought suit to recover for the loss; the insurer defended on the ground that the acts of the purchaser constituted a conversion of the automobile within the meaning of an exclusion similar [1] to the one involved in this case. In holding that the purchaser's acts did not constitute conversion of the lienholder's interest, the court noted that the "words 'embezzlement or secretion,' as used in [the exclusion], suggest crimes falling within the general category of theft or larceny, *the difference being that the original possession was obtained by lawful means." Id.* at 852 (emphasis added); *see Progressive American Insurance Co.,* 452 So.2d at 45 (quoting same).

We agree with appellant that *National Casualty Co.* and a recent case relying on that decision, *Progressive American Insurance Co.,* do not hold as appellees would have us believe. The portion of *National Casualty Co.* discussing "lawful possession" was clearly directed only to the policy language dealing with "embezzlement or secretion." Conversion, however, can be committed by someone who wrongfully acquires possession of the property. *See* W. Prosser, Law of Torts 84 (3rd ed. 1964). The reference in *National Casualty Co.* to "lawful possession" accordingly does not counsel holding that a conversion exclusion will be ineffective unless the converter lawfully acquired possession of the insured property.

*Security Insurance Co.* is also inapposite. In that case, the exclusionary clause referred to "loss ... resulting from misappropriation ... or any dishonest act on the part of ... any person ... to whom the property may be entrusted." *Security Insurance Co.,* 407 So.2d at 315–16 (emphasis deleted). After framing the issue as whether the insured could "entrust" prop-

---

**1.** The exclusion stated in part " 'that the conversion, embezzlement or secretion by the lessee, mortgagor or purchaser in possession of the property insured under a bailment lease, condi-tional sale, mortgage or other encumbrance is not covered under such policy.' " *National Casualty Co.,* 161 So.2d at 852.

erty to a thief, the court held that the policy exclusion did not encompass larceny by trick. *Id.* at 316. The court arrived at this conclusion by likening "entrustment" to "lawful possession." *See id.* (relying on *Collins*, 368 So.2d 941, a case interpreting a policy exclusion with "lawful possession" language).

Appellees fail to appreciate that the exclusion in this case refers only to "possession," not "misappropriation" by one to whom property has been "entrusted" or "lawful possession". No amount of judicial alchemy can change these fundamental distinctions in policy language. In our view, neither *Security Insurance Co.*, nor its predecessor, the *Collins* case, support appellees' position.

We also are unpersuaded by appellees' contention that the exclusion contains a hidden requirement that the converter be in possession of the property under a "valid" lease. The exclusion states that it applies "to loss [occurring during or resulting from] conversion ... by any person in possession of the aircraft under a ... lease." The exclusion does not mention any requirement that the agreement initially giving rise to the possession be legally enforceable. Since it is undisputed that the airplane was leased to Marchand, we discern no sound reason for holding the exclusion ineffective simply because the lease agreement arguably [2] was tainted.[3]

Appellees' final argument in support of the district court's judgment is two-pronged. They contend that (1) Marchand did not "convert" the airplane within the meaning of the exclusion since there is no evidence that he intended to *steal* the airplane; and (2) in any event, the loss of the insured property was due to a loss of fuel and not "due to conversion." We address these points seriatim.

■ Appellees, again relying on *National Casualty Co.*, 161 So.2d 848, assert that

2. Appellees assert that because of Marchand's misrepresentation, the lease was "invalid." As we understand appellees' position, however, Marchand's misrepresentations simply induced Carib to lease him the airplane. Properly viewed, the lease contract therefore was most likely "voidable" and not "void" or "invalid." *See* 1 A. Corbin, *Corbin on Contracts* § 6, at 12 n. 6 (1963) (emphasis added) (A contract that is fraudulently induced is voidable by the defrauded party. "He has the power of avoidance; but he also has a power to 'ratify,' and the contract is enforceable against the wrongdoer. Such a contract, therefore, has a considerable degree of legally operative effect—that is, *validity*."); *see also Columbus Hotel Corp. v. Hotel Management Co.*, 116 Fla. 464, 156 So. 893, 898 (1934) (fraudulently induced contract not illegal per se); *Leitman v. Boone*, 439 So.2d 318, 321 n. 3 (Fla. 3d Dist.Ct.App.1983) (contract induced by fraud still exists, and, even though later found voidable or void, certain of its provisions may be operative).

3. Appellees' reliance on *United States Fidelity & Guar. Co. v. J.D. Johnson Co.*, 438 So.2d 917 (Fla. 1st Dist.Ct.App.1983) is misplaced. In that case Johnson, a wholesaler of heating and air conditioning equipment, had a long-standing credit arrangement with Padgett, a retailer in the same business. Padgett's employees would routinely go to Johnson's warehouse to pick up equipment whenever it was needed. Padgett regularly visited the warehouse to pay off a portion of the outstanding indebtedness. A dispute eventually arose concerning the amount Padgett owed Johnson. Johnson claimed that, pursuant to the credit arrangement, $76,000.00 worth of property was delivered to Padgett or Padgett's employees. Padgett, however, insisted that $64,000.00 worth of equipment was unaccounted for.

When Padgett refused to pay, Johnson looked to USF & G to recover on an all-risk insurance policy it had issued. USF & G, however, asserted that it was not liable for any loss by virtue of an exclusion which provided that there would be no coverage for "[p]roperty sold by [Johnson] under conditional sale ... after delivery to customers." *Id.* at 919. The court stated that in these circumstances the exclusion "for loss of property sold pursuant to a long-standing credit arrangement necessarily contemplates a valid sales transaction and delivery of the property incident to such sale." *Id.* at 920–21. The court accordingly held that "[p]roperty delivered ... as a result of ... misrepresentation would not be pursuant to a valid sale transaction within the meaning of [the exclusion]." *Id.* at 921.

Even a superficial reading of *J.D. Johnson Co.* reveals that it is distinguishable from this case. First, the language of the exclusions found in the two cases is markedly different. Second, the *J.D. Johnson Co.* decision was informed by the existence of a long-standing credit arrangement. Here, Marchand simply approached Carib and thereafter acquired possession of an airplane for the stated purpose of flying to Orlando. Unlike *J.D. Johnson Co.*, no past practice is involved in this case.

"conversion," as used in the exclusion, refers to criminal, rather than civil, conversion. We agree that *National Casualty Co.* supports this view.[4] That decision, however, is not etched in granite.

Whatever Florida law may have been in 1964, the year *National Casualty Co.* was decided, the fact remains that since that time the Florida legislature has extensively revised the criminal code. For example, in 1977 the Florida Anti-Fencing Act, Fla.Stat. §§ 812.012–.037, was enacted. Under that legislation, "[a] person is guilty of theft if he knowingly *obtains or uses* ... the property of another with intent to ... [d]eprive the other person of a right to the property or a benefit therefrom." *Id.* § 812.-014(1)(a) (emphasis added). "Obtains or uses" is defined as "[c]onduct previously known as *stealing;* larceny; purloining; abstracting; embezzlement; misapplication; misappropriation; *conversion;* or obtaining money or property by false pretenses, fraud, or deception." *Id.* § 812.-012(2)(d)1 (emphasis added). It is clear, therefore, that prior to 1982, the year in which the parties executed the instant insurance policy, "conversion in the criminal sense," *National Casualty Co.*, 161 So.2d at 852, had been subsumed under the more general category of "theft," as defined by the omnibus theft statute. We accordingly have little difficulty concluding that, as used in the policy exclusion, "conversion" denotes civil, as well as criminal, conversion. *National Casualty Co.* simply is not controlling.

The argument that the loss of the airplane was caused by a loss of fuel, and therefore not "due to conversion" within the meaning of the exclusion, is more easily dismissed. Appellees ignore that part of the exclusion which excludes coverage for "loss or damage during or resulting" from conversion. "If damage occurs during conversion the policy does not cover it." *Gelder v. Puritan Insurance Co.*, 668 P.2d 1117, 1118, (N.M.Ct.App.1983) (construing identical policy exclusion).

■ There is little doubt that, under Florida law, Marchand converted the aircraft. "[C]onversion is an unauthorized act which deprives another of his property permanently or for an indefinite time." *Senfeld v. Bank of Nova Scotia Trust Co. (Cayman)*, 450 So.2d 1157, 1160–61 (Fla. 3rd Dist.Ct.App.1984) (footnote omitted) (citing *Star Fruit Co. v. Eagle Lake Growers, Inc.*, 33 So.2d 858 (Fla.1948) (en banc)). The essence of the tort is not the acquisition of the property; rather, it is the wrongful deprivation. *Star Fruit Co.*, 33 So.2d at 860. Apropos to this case, "[t]he wrongful destruction ... of personal property by a bailee, contrary to the terms [of the bailment], terminates the trust ... and [an] action for conversion will lie." *Id.*

It is clear that Carib leased the aircraft to Marchand only after he represented that he wished to make an inland flight from Miami to Orlando, and return. It is equally clear that he ditched the airplane in the ocean after attempting to smuggle contraband from the Bahamas. In our view, Marchand's unauthorized use of the aircraft, culminating in its destruction, constitutes conversion under Florida law.[5]

**4.** The court stated that "in using the word 'conversion' in connection with the words 'embezzlement and secretion' [the insurer] had reference to conversion in the criminal sense rather than as a tort." *National Casualty Co.*, 161 So.2d at 852.

**5.** Our conclusion is reinforced by two decisions nearly on all fours with the case *sub judice.* In *Swish Mfg. Southeast v. Manhattan Fire & Marine Ins. Co.*, 675 F.2d 1218 (11th Cir.1982), Swish leased a plane on which it carried insurance to Wings, Inc. Thereafter, the president of Wings piloted the plane to the Bahamas for the purpose of smuggling marijuana into this country. The plane, which was seized by Bahamian authorities, was damaged while in Bahamian control.

Swish demanded payment from the insurer. The insurer refused on the basis of an exclusionary clause identical to the one in this case. After examining Georgia case law and the *Restatement (Second) of Torts* §§ 222A–242 (1965), the *Swish* court held that, as a matter of law, the airplane had been converted. Swish therefore was unable to recover from the insurance company.

Similarly, in *Gelder*, 688 P.2d 1117, Gelder leased an airplane to a lessee who agreed not to use the plane for unlawful purposes. The

## IV. CONCLUSION

We conclude that the language of National's exclusion clause is unambiguous and not otherwise susceptible of more than one meaning. We further conclude, after applying "the plain meaning of [the] words and phrases" found in the exclusion, *Lehrman,* 443 So.2d at 409, that the insured property was lost or damaged during its conversion by someone possessing it under a lease. The conversion exclusion therefore applies and no coverage is available to appellees.[6]

The decision of the district court is REVERSED and judgment is hereby entered in favor of National.

plane, piloted by the lessee, crashed upon take-off just after its cargo of marijuana had been unloaded. The insurer refused to indemnify Gelder for the loss. As in *Swish,* the insurer grounded its refusal on an exclusionary clause identical to the one in this case. Relying on § 228 of the *Restatement, supra,* New Mexico precedent, and the *Swish* decision, the *Gelder* court also concluded that a conversion had taken place. Gelder, therefore, was not entitled to payment from the insurer.

Although *Swish* and *Gelder* were decided by reference to the law of Georgia and New Mexico, respectively, not Florida law, we discern no material difference in the law of conversion in the three forums. We therefore find the reasoning employed in those two decisions to be highly persuasive and applicable to the facts of this case.

6. The district court discussed, although it did not base its decision on, Fla.Stat. § 627.409(2). *Carib,* 566 F.Supp. at 1491. This statute provides in part:

A breach or violation by the *insured* of any ... provision of any ... contract of insurance ... shall not render void the ... contract, or constitute a defense to a loss therefrom, unless such breach or violation *increased the hazard* by any means within the control of the insured.

Fla.Stat. § 627.409(2) (emphasis added). The district court noted that even though smuggling drugs could increase the risk of loss of an airplane, National failed to offer any proof of this fact. The court also declined to take judicial notice of the fact. In its motion for reconsideration, however, National did tender to the court an affidavit of an underwriting expert who stated that use of an aircraft to transport illegal substances unquestionably increases the risk of loss from an insurance underwriting standpoint. Record at 116–17. The court, in denying National's motion, again stated its belief that the dangerousness of drug smuggling via aircraft was not a proper subject of judicial notice. *Id.* at 120.

Although the district court explicitly refused to base its decision on § 627.409, we note that subsection (2) embraces only "[a] breach or violation by the insured." National has never argued that Carib or Fiddyment somehow breached or violated the contract of insurance. National simply denied coverage on the basis of an exclusionary provision. In our view, the statute, *Proprietors Ins. Co. v. Siegel,* 410 So.2d 993 (Fla. 3d Dist.Ct.App.1982), and *Pickett v. Woods,* 404 So.2d 1152 (Fla. 5th Dist.Ct.App. 1981), *review denied,* 412 So.2d 465 (Fla.1982), are therefore inapposite.